IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| WILLIE THOMPSON | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-05-362 |
| | § | |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF SOCIAL SECURITY | § | |

**REPORT AND RECOMMENDATION**

Before the Court is Plaintiff Willie Thompson's action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), requesting a judicial review of a final decision of the Commissioner of the Social Security Administration denying his claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. Both parties have filed Motions for Summary Judgment. After considering the parties' motions and the record in this case, the Court submits its Report and Recommendation to the District Court.

**I.**

**BACKGROUND**

**A. Administrative Proceedings**

Plaintiff filed his application for disability insurance benefits with the Commissioner on July 31, 2001, claiming that his disability began on March 5, 2001, due to back pain and "extreme fatigue, nausea, headaches, muscle aches, fever, diarrhea, and bleeding hemorrhoids caused by

chronic hepatitis C." Transcript ("Tr.") at 62-64, 67. His disability insurance claim was denied initially and also upon reconsideration. Tr. at 27-28, 32-41.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held before an ALJ on June 11, 2003. Tr. at 16, 359-370. Plaintiff was represented by counsel at the hearing. The only testimony at the hearing was from Plaintiff. Tr. at 359-370. Following the hearing, the ALJ sent interrogatories to a Dr. Gipson on June 27, 2003 (Tr. at 334), which he completed and signed on August 15, 2003. Tr. at 335-337. On October 9, 2003, the ALJ issued an unfavorable opinion. Tr. at 13-26.

Plaintiff requested review of the ALJ's decision by the Appeals Counsel on April 19, 2005, and, in his request, included additional medical records. Tr. at 338-358  The Appeals Council considered Plaintiff's request for review, as well as the additional evidence (Tr. at 338-358), and on June 16, 2005, concluded that there was no basis for granting the request for review. Tr. at 5-9. The decision of the ALJ thereby became the final decision of the Commissioner, and it is from this final decision that the appeal has been taken pursuant to 42 U.S.C. § 405(g).

**B. Factual Background**

At the time he filed his application for disability benefits in 2001, Plaintiff was approximately 46 years old. Tr. at 62. Plaintiff attended high school and obtained a G.E.D. Tr. at 363. His work experience is listed as that of an industrial engineer manager in the aerospace industry and he performed this work for approximately 22 years. Tr. at 68.

The medical records show Plaintiff was diagnosed with Hepatitis-C ("Hep-C"), genotype 1A, in 1992. Tr. at 246. In late March 2000, lab results revealed active Hep-C and Plaintiff was referred by his treating physician for further evaluation and consideration of treatment options. Tr. at 269.

2

Plaintiff consulted with Dr. Bala for Hep-C treatment on May 4, 2000. Tr. at 246. Dr. Bala's impression was chronic Hep-C with elevated liver enzymes and a positive PCR with a viral count of 5 million copies per ml. Tr. at 264. Plaintiff underwent an ultrasound guided liver biopsy on June 6, 2000, which revealed "mildly reactive" Hep-C, without fibrosis or stainable iron. Tr. at 185, 262. On July 17, 2000, Dr. Bala began treating Plaintiff with Rebetron, an interferon drug, for his Hep-C. Tr. at 246. Plaintiff's treatment with interferon treatment continued until March 29, 2001, at which time the medical records reflect that it was discontinued because Plaintiff was only having a partial response to the treatment and that he was experiencing side effects to the treatment, which included fatigue. Tr. at 130, 141,155, 247-48, 312. During the course of this treatment, Dr. Bala's progress notes reflect that while he tolerated the medication fairly well, he did have complaints of tiredness and fatigue. Tr. at 184. The progress notes from this treatment phase also noted that Plaintiff has a history of depression, even though he repeatedly denied it (Tr. at 183, 259), and that due to the depression he was placed on the antidepressant Paxil, which"seem[ed] to control the symptoms [of depression] better." Tr. at 184, 247.

In the two months following the cessation of his treatment, Plaintiff reported to Dr. Bala that he continued to feel fatigued, weak, and lacked energy to the extent that he was unable to perform his duties at work. Tr. at 128, 130. Plaintiff continued to deny depression, but he remained on Paxil. Tr. at 126, 128. On June 5, 2001, Plaintiff's complaints included "severe fatigue and tiredness" (Tr. at 126) and Dr. Bala recommended additional interferon treatment because he believed "clearance of the virus may improve his fatigue." Tr. at 129.

On July 3, 2001, Plaintiff began another course of treatment for his chronic Hep-C, but this time he was given "PEG-Intron plus Ribavirin." Tr. at 124, 179. Plaintiff's treatment with this

interferon treatment continued a year and then, in July 2002, was discontinued because Plaintiff was not adequately responding to the treatment. Tr. at 153. During the course of this interferon combination treatment, the progress notes contain repeated complaints of both tiredness and fatigue of increasing severity. Tr. at 123, 124, 153,158,160, 170-171, 175, 178, 179. Dr. Bala's assessment of Plaintiff in early January 2002, included "severe fatigue from the underlying disease plus treatment." Tr. at 170-171. In addition, Plaintiff began reporting feelings of dizziness (Tr. at 153, 154,160), occasional nausea (Tr. at 153, 158), and a lack of concentration (Tr. at 153, 158). The medical records during this period reflect Plaintiff's continued, albeit somewhat increased dosage, of an antidepressant, that Dr. Bala indicated "seem[ed] to control the depression." Tr. at 124, 154, 170, 175, 179.

After his treatment was discontinued in July 2002, Plaintiff continued to complain to Dr. Bala and Dr. Le of severe fatigue and that he was only able to engage in activities for 3-4 hours before having to lie down and rest. Tr. at 148, 313-315. Plaintiff continued to report difficulty with concentration. The records also reflect that Plaintiff remained on an antidepressant to control his depression, but due to side effects of Paxil, Dr. Le changed him to a different type of antidepressant. In December 2002, Plaintiff's general examination was noted to be unremarkable, with no neurological deficits, and his lab results now showed only mildly elevated liver enzymes. Tr. at 313. Nevertheless, Plaintiff's complaints of fatigue continued. Dr. Bala explained that the common symptoms of Hep-C included fatigue and muscle or joint ache (Tr. at 311), and further explained that the documented side effects of the interferon treatment included depression and extreme fatigue (Tr. at 311, 313, 326), but stated that there was "no objective way to measure the fatigue." Tr. at 313. Dr. Bala referred Plaintiff to a specialist for further evaluation, management and treatment

approaches to "clear the [Hep-C] infection," as well as consideration of drugs to alleviate the fatigue. Tr. at 315.

Plaintiff saw Dr. Ankoma-Sey on May 23, 2003, for further evaluation as recommended by Dr. Bala. Tr. at 321-22. Dr. Ankoma-Sey noted Plaintiff's weight as 160 pounds, which reflected a 29-pound weight loss since November 18, 2002. Tr. at 293, 321. Plaintiff reported to Dr. Ankoma-Sey that he continued to experience ongoing problems with fatigue. Tr. at 321. Dr. Ankoma-Sey noted that Plaintiff had a past history of "mild depression" for which he was treated with Zoloft and Paxil, however, he noted that Plaintiff had since discontinued these medications. Tr. at 321. Dr. Ankoma-Sey recommended that Plaintiff undergo a psychiatric evaluation because he thought it "could be concomitant factor in his severe fatigue," discontinue the Vicodin as this too could be a factor contributing to his lethargy, and prescribed Ultram, to replace the Vicodin, and Provigil, to help with the fatigue. Tr. at 322. On July 31, 2003, Plaintiff returned to see Dr. Ankoma-Sey and, while he reported that he had experienced a "slight improvement in [his ] fatigue"since taking Provigil, he now experienced nausea on a daily basis, felt sleep deprived, experienced difficulty driving due to the fatigue, and experienced feelings of depression that included crying at home. Tr. at 319. Dr. Ankoma-Sey noted his impressions as "HVC; Fatigue; Moderate depression." Tr. at 320.

On August 13, 2003, the Plaintiff saw psychiatrist Dr. Anu Matorin. Tr. at 330. Plaintiff reported to Dr. Matorin that "he experienced symptoms consistent with depression during both his previous Interferon therapies," which consisted of dysphoria, mood lability, irritability, crying spells, and worsening fatigue. Tr. at 330. Plaintiff stated that "Dr. Ankoma-Sey prescribed an antidepressant, Celexa 20 m.g., and since taking it he had noticed improvement in his mood as he

5

was no longer experiencing crying spells, agitation, irritability, or suicidal ideation. However, Plaintiff reported that he still experienced "lingering fatigue, dizziness, apathy, poor energy, and decreased interest." Tr. at 330. Upon examination, Dr. Matorin noted that "patient was neatly groomed" in appearance, "he is cooperative," "makes good eye contact," "engagable," his mood or affect revealed "mild dysphoria and anxiety," there was no agitation or lability, no suicidal or homicidal ideation, and cognition intact." Tr. at 332. Dr. Matorin also noted that Plaintiff "states his mood and overall functioning has been as low as 3-4/10," but "with the Celexa at that present time he states his is 8-9/10. Tr. at 332. Dr. Matorin's assessment of Plaintiff was "depression secondary to general medical condition (interferon therapy and Hep-C), fatigue which was induced by the Hep-C, and sleepiness and apathy secondary to that." Tr. at 332. Dr. Matorin recommended Plaintiff's continuation on the antidepressant, cleared him for additional interferon treatment, and a follow-up psychiatric visit. Tr. at 332.

In addition to his treatment for Hepatitis-C, Plaintiff's medical records, dating back to 1999, reflect he was seen periodically by Dr. Truong and then Dr. Le for different conditions that included check-ups for sexually transmitted diseases, hemorrhoids, and back pain. With regard to his back pain, there is also some mention in 2000 that Plaintiff had a history of low back pain, reported to be the result of a lumbar disc herniation. However, there are no x-rays, MRIs or other diagnostic studies in the record, and it appears that Plaintiff's complaints of back pain were treated with prescription medication that, at different times from June 2000 to November 2002, included Ibuprofen, Flexeril, Vicodin, Naprosyn, and Bextra. Tr. at 253, 270-272, 293-294, 295-296.

At the hearing Plaintiff testified that he stopped working two years ago because of the Hep-C and the treatment and testified that the "severe fatigue" bothered him the most. Tr. at 363. He

testified he was an industrial engineering manager for United Space Alliance at the Space Center, but that he could not do this work anymore because of the fatigue. Tr. at 364. Plaintiff stated that instead of decreasing, the fatigue has only gotten worse and he was only able to function for about 2-3 hours at a time before then having to lie down and rest. Tr. at 364. At the time of the hearing Plaintiff testified that he was not then taking any medication to treat his Hep-C condition, but that he was seeing a new doctor and they had discussed additional medication and treatment. Tr. at 364. Plaintiff testified that his household chores or daily activities include feeding the dogs, doing the laundry, some light maintenance around the house, and sometimes going grocery shopping. Tr. at 364. He does not do much, if any, yard or garden work. Tr. at 364. He testified that he occasionally goes to church, has gone to a meeting at his son's school for sports (Tr. at 365), and he tries to get up and walk a little bit, but explained it was "pretty limited." Tr. at 366. He responded that he smokes occasionally (Tr. at 365) and conceded he drinks alcohol, but "not very often." Tr. at 366. Plaintiff testified that he can probably sit for an hour at a time, he could probably pick up and carry anything under 10 pounds, and could probably walk for about 30 minutes. Tr. at 366. Plaintiff also stated that, while he can drive, he was experiencing problems driving for longer than 30 minutes because of his fatigue. Tr. at 366-367.

     After consideration of the entire record, the ALJ made the following findings:

1.      The claimant met the disability insured status requirements of the Social Security Act on March 5, 2001, the date he stated that he became unable to work and continued to meet them through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.      The medical record demonstrates that the claimant has the following medically determinable impairment: hepatitis C.

    4.       This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

    5.       The undersigned finds the claimant's allegations regarding his subjective complaints and functional limitations are not totally credible or consistent with the evidence of record as a whole for the reasons set forth in the body of the decision.

    6.       The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 404.1527).

    7.       The claimant has the residual functional capacity to work at least sedentary work.

    8.       The claimant is unable to perform any of his past relevant work as an engineering manager. (20 CFR § 404.1565).

    9.       The claimant is 48 years of age defined as a "younger individual" (20 CFR § 404.1563).

    10.      The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

    11.      The claimant has transferable skills from semi-skilled work previously performed (20 CFR § 404.1568).

    12.      The claimant has the residual functional capacity to perform the full range of sedentary work. (20 CFR § 404.1567).

    13.      Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.22, Appendix 2, Subpart P, Regulations No. 4.

    14.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

Tr. at 25-26.

As mentioned, after the ALJ issued a decision, the Plaintiff appealed the decision to the Appeals Council and submitted additional information concerning his subsequent treatment. The records before the Appeals Council were progress letters from Dr. Ankoma-Sey. The records included by the Appeals counsel consisted of a number of progress letters from Dr. Ankoma-Sey

to Dr. Bala concerning Plaintiff's condition. These progress letters reflect Plaintiff's continued complaints of fatigue, as well as a resumption in or around February of 2004, of an interferon combination treatment for his Hep-C. Tr. at 346-355.

## II.

### DISCUSSION

A.  <u>Standard of Review</u>

A federal court reviews the Commissioner's denial of benefits only to ascertain whether (1) the final decision is supported by substantial evidence and (2) the Commissioner used the proper legal standards to evaluate the evidence. *Brown v. Apfel*, 192 F.3d 472, 473 (5th Cir. 1999). "Substantial evidence," as defined in the Act, means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). If the Commissioner's findings are adjudged to be supported by substantial evidence, then such findings are conclusive and must be affirmed. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). A court does not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. *Id.* Conflicts in the evidence are for the Commissioner, not the Court, to resolve. *Brown*, 192 F.3d at 496.

To determine whether an individual is disabled, the Commissioner utilizes the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(b)-(f). A claimant bears the initial

burden of proving he suffers from a disability under the Social Security Act. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). If the Commissioner decides at any step along the way that an individual is not disabled, the evaluation process comes to a halt at that particular step and proceeding further becomes unnecessary. *Barajas v. Heckler*, 738 F.2d 641, 643 (5th Cir. 1984). However, if the claimant shows that he is disabled under the first four steps, the burden then shifts to the Commissioner at the fifth step to demonstrate that the claimant can perform other substantial work in the national economy. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995). Only if the final step in the process is reached does the fact-finder consider the claimant's age, education, and work experience in light of his or her residual functional capacity. *See Rivers v. Schweiker*, 684 F.2d 1144, 1152-1153 (5th Cir. 1982).

In this case, the focus of Plaintiff's challenge is on the determination that he retained the residual functional capacity to perform a full range of sedentary work. In essence, it appears Plaintiff's claims that the ALJ: (1) failed to give proper weight to his treating physicians opinions regarding his limitations and instead improperly relied upon an opinion from a non-treating, non-examining source; (2) failed to consider the side effects of medication or treatment on his ability to work or maintain employment; and (3) erroneously relied upon the Medical-Vocational Guidelines.

B. <u>Residual Function Capacity</u>

The Social Security regulations define residual functional capacity ("RFC") as the maximum degree to which the individual retains the capacity for sustained performance of the physical and mental requirements of jobs. 20 C.F.R. § 404, Subpt. P, App. 2 § 200.00(c). The RFC evaluation is an assessment of an individual's ability to do sustained-related physical and mental activities in a work setting on a regular and continuing basis. *Myers v. Apfel*, 238 F.3d

617, 620 (5th Cir. 2001). "A regular and continuing basis means 8 hours a day, for 5 days a week, or equivalent work schedule." *Hector v. Barnhart*, 337 F.3d 905, 924 (S.D. Tex. 2004). An ALJ has the responsibility for determining a claimant's RFC. *Ripley*, 67 F.3d 552, 557 (5th Cir. 1995). The ALJ's determination is reached through a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).

### 1. Medical Opinions Presented to ALJ Concerning Plaintiff's Impairments

The record before the ALJ contained opinions from both Dr. Le and Dr. Bala[1] concerning Plaintiff's limitations. Notably, both Dr. Le and Dr. Bala opined that, due to his condition, in an eight-hour workday Plaintiff could sit for 4 hours and walk/stand for 2 hours, but would need to lie down or recline for 2 hours (Tr. at 208, 297), would "frequently" need rest periods during the day, would "occasionally" miss work, and would probably be an "unreliable" worker as a result of the condition and its treatment. Tr. at 211-212, 300-301.

Also before the ALJ was the opinion of Dr. Gipson, a non-treating, non-examining physician, whose opinion was set forth in his responses to interrogatories. Tr. at 335-337. Dr. Gipson responded that Plaintiff's main impairment was "chronic Hepatitis C" and classified it as "moderate" in severity. Tr. at 335. Dr. Gipson answered "no" in response to a question that asked whether Plaintiff was taking "any medication or treatment which would be expected to cause dizziness, nausea, fatigue, blurred vision, drowsiness, or other significant side effects that would affect normal physical or mental activities of daily living." Tr. at 335. He further responded that the medical records he reviewed did not indicate any other significant impairment. Tr. at 335. Additionally, in

---

[1] Dr. Bala is occasionally erroneously referred to as Dr. Nala in the ALJ's decision.

his responses Dr. Gipson stated that Plaintiff could do the following: walk or stand up to 5 hours per day; occasionally lift/carry up to 20 pounds; frequently lift/carry up to 10 pounds; occasionally bend, stoop, or climb stairs; and he would be able to grasp or handle large objects and pick up small objects. Tr. at 336. Dr. Gipson also opined that if Plaintiff was "receiving out-patient therapy" he could still perform a low stress job with continued therapy. Tr. at 337.

The ALJ determined that Plaintiff could perform a full range of sedentary work on a sustained basis. In making his determination, the ALJ stated that he gave little weight to Drs. Le and Dr. Bala's opinions concerning Plaintiff's limitations. In fact, however, in reviewing his decision, it does not appear that the ALJ gave any weight to either Dr. Le's or Dr. Bala's opinion when determining Plaintiff's residual functional capacity ("RFC").

A treating physician's assessment of residual functional capacity is a medical opinion. *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995); *Bridges v. Callahan*, 20 F. Supp.2d 520, 527 (E.D.N.Y. 1998). Ordinarily, the opinions of treating physicians are given considerable weight in determining disability. This is especially true when the treatment period has been over a considerable period of time. *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). An ALJ can give less weight to the opinion if good cause is shown. *Myers*, 238 F.3d at 621. Good cause includes conclusory statements from the treating physician, opinions otherwise unsupported by the evidence, or conclusions unsupported by medically accepted clinical techniques. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). However, "a finding that a treating sources medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Social Security Ruling

("SSR") 96-2p. Instead, the regulations require an ALJ to weigh the opinions from a medical source using all the factors set forth in the regulations. The regulations require consideration of all the following factors: (1) the physician's length of treatment; (2) the frequency of examinations; (3) the nature and extent of the treatment relationship; (4) the support found in the medical evidence on record; (5) the consistency of the opinion with the record as a whole; and (6) the physician's specialization. 20 C.F.R. § 404.1527(d)(2).

Consistent with the regulations, this Circuit has determined that "an ALJ is required to consider each of the § 404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating specialist" (*Newton*, 209 F.3d at 456) and the decision "must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455. In addition, when "the ALJ determines that the treating physicians records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)." *Newton*, 209 F.3d at 453.

Reviewing the ALJ's decision in this case, the Court finds that it contains a discussion of some, but not all, of the required factors. Specifically, the decision does not include the length of the treatment, the frequency of the examinations, and the specialty of the treating physicians. Moreover, although essentially concluding that the medical records were inconclusive or inadequate to support the opinions, there is no indication that the ALJ sought additional information or

clarification from either Dr. Le[2] or Dr. Bala[3] before giving little or no weight to their opinions regarding Plaintiff's limitations. An ALJ has a duty to develop the facts fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Ripley*, 67 F.3d at 557; *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2nd Cir. 1999) (An ALJ should not "reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.")

Instead, similar to the facts in *Newton*, the ALJ's decision reflects that he gave significant weight to and relied upon the opinion of Dr. Gipson, a non-treating, non-examining physician. Dr. Gipson, whose specialty is unclear, completed 18 interrogatories (Tr. at 335-337) at the request of the ALJ and his August 15, 2003, opinion is based on "*copies of exhibits of the pertinent medical evidence*" that remain unidentified. [Emphasis added]. Tr. 334. There is no indication in the record of Dr. Gipson's qualifications. There is also no indication of which, if not all, of Plaintiff's medical records Dr. Gipson did review in reaching his opinion, nor is there anything in the record that explains the basis for his opinion. There is also no indication that Dr. Gipson considered the symptoms or side effects, to include fatigue, of the underlying condition or the drugs used to treat the condition. Nevertheless, the ALJ relied upon Dr. Gipson's conclusory and unsubstantiated opinion concerning Plaintiff's limitations or lack thereof. Although recognizing that conflicts between the conclusions of different physicians are reserved for the Commissioner (*Loya v. Heckler*,

---

[2] The medical records contained a diagnosis from both Dr. Truong and Dr. Le of low back pain, which appeared to be the result of a prior lumbar herniation.

[3] The medical records reflect Plaintiff's numerous complaints of fatigue. Although Dr. Bala stated that Plaintiff's fatigue could not be objectively measured, he had previously explained that fatigue was a common symptom of the Hep-C, as well as a side effect of the treatment for Hep-C.

14

707 F.2d 211, 215 (5th Cir. 1983)), an ALJ "must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Moreover, in considering the opinion of a non-examining source, the ALJ is required to consider and discuss the same factors in the decision 20 C.F.R. § 404.1527(f). Here, the ALJ neglected to do so and, as such, did not apply the proper legal standards to evaluate the evidence. *Id.*

Although this Court recognizes that an ALJ may still determine the maximum degree to which the claimant retains the capacity for sustained performance of the physical and mental requirements of jobs, in doing so his decision must be supported by substantial evidence in the existing record. *See Ripley*, 67 F.3d at 557. Substantial evidence, however, does not support the ALJ's decision in this case. Specifically, aside from Dr. Gipson's conclusory opinions which were not evaluated by the ALJ using the proper legal standards, there is no contrary or conflicting evidence submitted as to Plaintiff's condition, treatment, or limitations. The evidence that was available for review by the ALJ showed a diagnosis of chronic Hep-C, genotype 1A, with an active condition for which he had been treated initially with Rebetron from July 2000 through March 2001, and then with Peg-Interon from July 2001 to July 2002, laboratory tests reflecting positive PCR levels, elevated liver enzymes, low platelet counts, frequently abnormal blood results,[4] treatment by medication for depression, and recurring complaints of fatigue. In the opinion of Dr. Bala, who saw Plaintiff approximately 22 times from May 2000 through January 2003, and Dr. Le, who not only

---

[4] Tr. at 187-189, 190-191, 194-196, 197-199, 200-201, 203-205, 205-207, 215-216, 217-219, 220-221, 224-225, 226-227, 228-230, 231-232, 239-240, 241-242, 244-245, 264.

followed the progress of his Hep-C treatment with Dr. Bala,[5] but also saw Plaintiff on several occasions, Plaintiff would have to lie down and rest 2 hours in an 8 hour workday.  The only other evidence regarding Plaintiff's ability to work came from Plaintiff himself.  Tr. at 363-367.  Plaintiff testified to his activities, but also stated that he is unable to function for more than 2-3 hours at a time without having to then lie down.  Tr. at 364.  Although the ALJ included Plaintiff's testimony concerning his activities (Tr. at 23), he failed to consider Plaintiff's limitations in performing these tasks.  Instead, the ALJ dismisses the need for Plaintiff to lie down at any time in the day as it is unsupported by his medical records.[6]  However, as discussed, the ALJ finding is fundamentally at odds with both Drs. Le and Bala's medical opinions concerning his limitations based on his condition and treatment.  Tr. at 297-302, 208-213.  Substantial evidence does not exist in the record to support the ALJ's determination there were no exertional or nonexertional limitations from the effects of Plaintiff's condition or treatment that would not affect his ability to perform a full range of sedentary work.  *See Loza*, 219 F.3d at 395 (an ALJ is entitled to resolve conflicts in the medical evidence and make decisions regarding credibility, but he is not entitled to make medical

---

[5]The records reflect that Dr. Bala "cc'd" Dr. Le on Plaintiff's Hepatitis-C treatment allowing him to follow Plaintiff's status.  In addition, the records before the ALJ reflect that Plaintiff saw Dr. Le during his treatment and, while apparently overlooked by the ALJ, Plaintiff saw Dr. Le in November 2002.

[6] The ALJ appears to have discounted fatigue as either an exertional or nonexertional limitation because Plaintiff's complaints of fatigue were not supported by objective clinical and laboratory findings.  However, it is well established in this Circuit that a subjective symptom can be disabling even when its existence is unsupported by objective medical evidence if it is linked to a medically determinable impairment.  *Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981). Moreover, despite the general medical evidence requirement, symptoms or side effects arising from a condition or treatment, courts have cautioned against summarily rejecting complaints of fatigue on the basis that there is no "dipstick" laboratory test to measure the existence or effect of the symptom.  *See Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 744 (10th Cir. 1993).

judgments); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) (ALJ's are lawyers without medical expertise and, although schooled about the regulations, they are not empowered to rely on their "lay intuitions about medical phenomena" to overrule a physician).

### 2. Consideration of the Effect of Plaintiff's Medical Condition and Treatment

Plaintiff claims that as a result of both his condition and the interferon treatments that he suffered from severe fatigue that affected his ability to work a full 8 hour day. He appears to claim that the ALJ failed to consider that the effect of his condition, the effect of the interferon drugs, and the ongoing course of his treatment during the period of claimed disability rendered full-time work impossible.

The Fifth Circuit has held that if an individual's medical treatment significantly interrupts the ability to perform a normal, 8-hour work day, then the ALJ must determine whether the effect of the treatment precludes the claimant from engaging in gainful activity. *See Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980). Moreover, under the regulations, the ALJ is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(iv).

Here, the ALJ's decision does not reflect that he considered the nature of the Plaintiff's different treatments and the drugs involved, the dosages, or a recognition of the side effects of either the condition or the drug treatment as required by the regulations. While the ALJ's decision reflects that Plaintiff "was tolerating the medications fairly well," (Tr. at 21), these finding are at odds with the medical records that reflect the recurrent complaints of Plaintiff and are also contrary to his testimony concerning the effects of the Hep-C condition, was well as the side effects of the interferon treatment. *Loza*, 219 F.3d at 393. (an ALJ "must consider all the record evidence and

cannot 'pick and choose' only the evidence that supports his position.").

In summary, for the reasons discussed, this Court recommends that this case be remanded so as to fully develop the record based on opinions of medical sources regarding whether Plaintiff retained the residual functional capacity to perform the exertional and non-exertional demands of sedentary work. Consideration should be given to whether an overlay exists between the fatigue and depression.[7] The Plaintiff's credibility should be reassessed in light of these opinions and any newly obtained information.

### C. Application of The Medical-Vocational Guidelines

Plaintiff contends that the ALJ erred in relying exclusively on the Medical-Vocational Guidelines in determining whether he was disabled and not seeking the assistance of a vocational expert. The Medical Vocational Guideline Grids ("Grid Rules") exist when determining whether there is work in the national economy that claimant could perform despite his disability. 20 C.F.R, Part 404, Subpt. P, App. 2. It is appropriate for an ALJ to rely exclusively on the Grid Rules "when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonextertional impairments do not significantly affect his residual functional capacity." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) *See also, Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If, however, a claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that such jobs exist in the economy. *Fraga*, 810 F.2d at 1304.

---

[7]Although not clearly articulated by Plaintiff, to the extent he relies upon the records from Drs. Ankoma-Sey and Dr. Matorin to establish a possible overlay between the depression, the medication used to control the depression, and the fatigue, the Court observes that this issue was not addressed by the ALJ in the decision when considering non-exertional limitations. To the extent raised, it may also be appropriate to address and clarify this matter upon remand.

Since this Court concludes that the ALJ's findings concerning Plaintiff's residual functional capacity were determined by an improper legal standard and not supported by substantial evidence, and that the ALJ failed to properly consider the side effects of his condition and interferon treatment on his ability to work, the Court must likewise conclude that exclusive reliance on the Grid Rules was in error. *Crowley*, 197 F.3d at 199. If, upon remand, Plaintiff is found to suffer from significant nonexertional impairments or a combination of exertional and nonexertional impairments, application of the Grid Rules would not be appropriate and it would be necessary for the Commissioner to introduce testimony from a vocational expert that jobs exist in the economy that Plaintiff can perform. *Fraga*, 810 F.2d at 1304.

## Conclusion

For all the reasons stated above, the Court therefore **RECOMMENDS** that the Plaintiff's Motion for Summary Judgment (Instrument No. 9) be **GRANTED** and that Defendant's Motion for Summary Judgment (Instrument No. 10) be **DENIED**. The Court further **RECOMMENDS** that the ALJ's decision be **REVERSED** and **REMANDED to the Social Security Administration for further consideration consistent with this opinion.**

The Clerk **SHALL** send copies of this Report and Recommendation to the Parties. The Parties **SHALL** have until **September 18, 2006**, in which to have written objections, filed pursuant to 28 U.S.C. § 636(b)(1)(C), **physically on file** in the Office of the Clerk. <u>The Objections **SHALL** be electronically filed and/or mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553</u>. **Any Objections filed SHALL be contained in a written document specifically entitled "Objections to the Report and Recommendation of the Magistrate Judge"**, which will then be forwarded to the District Judge for consideration. Failure to file written objections within

the prescribed time **SHALL** bar the aggrieved party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

    **DONE** at Galveston, Texas, this _____1st_____ day of September, 2006.

                                                                 _____
                                                                  John R. Froeschner
                                                                  United States Magistrate Judge